**STATE of Minnesota, Plaintiff,**

v.

**Virginia Juanita BRIARD, Defendant.**

**No. A09–1977.**

Court of Appeals of Minnesota.

July 13, 2010.

Lori Swanson, Attorney General, St. Paul, MN; and Michael D. Fritz, Becker County Attorney, Gretchen D. Thilmony, Assistant County Attorney, Detroit Lakes, MN, for plaintiff.

Earl P. Gray, St. Paul, MN, for defendant.

Considered and decided by STONEBURNER, Presiding Judge; TOUSSAINT, Chief Judge; and CONNOLLY, Judge.

## OPINION

CONNOLLY, Judge.

Defendant was charged with six counts of felony criminal contempt in violation of

Minn.Stat. § 588.20, subd. 1 (2008) for allegedly willfully failing to appear as a witness in her husband's criminal trial. In this certified-question appeal, defendant challenges service of process of the subpoenas compelling her testimony. After modifying the certified questions to omit extraneous factual information, we answer them both in the negative.

## FACTS

Defendant Virginia Juanita Briard and her husband Robert Briard live at 38501 County Highway 56 in Frazee, which is a hog farm owned by defendant and her husband and managed with the assistance of their adult son, Ashley Briard. Husband was charged in January 2007 with first-degree criminal sexual conduct in violation of Minn.Stat. § 609.342, subd. 1(a) (2006),[1] alleging he had sexually abused one of his daughters. First-degree criminal sexual conduct is considered to be a crime of violence. *See* Minn.Stat. §§ 588.20, subd. 1 (2008), 609.11, subd. 9 (2006). On October 25, 2006, defendant gave a statement to investigators that husband had made certain admissions to her relating to the criminal-sexual-conduct allegations. The state sought to procure defendant as a witness for husband's trial.[2]

On October 10, 2008, the state attempted service upon defendant of a subpoena to appear in husband's trial, scheduled to begin on October 27. Service of process was attempted by Becker County Sheriff's Investigator Scot Blaine leaving a copy of the subpoena with husband at 38501. Husband told Blaine something to the effect that he was "not getting involved in that." Blaine explained to husband that he had been served and asked what he should do with the subpoena. Husband pointed to the doormat outside of the door and then closed the door without picking up the subpoena. The subpoena directed defendant to appear as a witness in district court on October 27 through October 30. Husband's trial was subsequently continued and scheduled to begin on December 8.

On December 3, 2008, the state again attempted service upon defendant of a subpoena to appear at husband's trial. This time attempted service was made by Becker County Sheriff's Investigator John Sieling at 38501, but by leaving the subpoena with Ashley. Ashley refused to take the subpoena; told Sieling he was not going to talk to him; and proceeded to walk away towards a building. Sieling informed Ashley that he had been served and that Sieling was "leaving the service with [him] for [his] mother." Sieling then stated that he was leaving the subpoena in the back of Ashley's truck. Sieling did not recall it being windy. Defendant failed to appear for husband's trial.

---

1. There appears to be a typographical error in the district court's October 13 order, which refers to the statute under which husband was charged as "Minn.Stat. § 609.442(a)." This statute does not exist and it appears to us that the correct statute was likely Minn.Stat. § 609.342, subd. 1(a). We also presume, based on the record before us, that husband was charged under the 2006 version of the statute.

2. *See* Minn.Stat. §§ 595.02, subd. 1(a) (stating marital privilege does not apply in "a criminal action or proceeding for a crime committed ... against a child of either [spouse] or against a child under the care of either spouse"), 626.556, subd. 8 ("No evidence relating to the neglect or abuse of a child ... shall be excluded in any proceeding arising out of the alleged neglect or physical or sexual abuse on the grounds of privilege set forth in section 595.02, subdivision 1, paragraph (a), (d), or (g).") (2008); *State v. Willette*, 421 N.W.2d 342, 346 (Minn.App.1988) (holding Minn.Stat. § 626.556, subd. 8 "permits adverse spousal testimony on alleged sexual abuse of children"), *review denied* (Minn. May 16, 1988).

Defendant was subsequently charged by amended complaint with six counts of felony contempt of court in violation of Minn. Stat. § 588.20, subd. 1. One count was for October 27 and five counts were for husband's trial (December 8, 9, 10, 11, and 12). Defendant subsequently filed a motion to, among other things, dismiss all counts on grounds of lack of jurisdiction and lack of probable cause based on deficient service and the lack of "credible evidence that [defendant] had the actual or requisite notice to have been capable of committing the offenses charged." [3]

The parties appeared before the district court at an omnibus hearing on May 8, 2009. The testimony at the hearing primarily addressed the December 3 subpoena. Sieling testified that prior to leaving the subpoena with Ashley, he contacted the post office to determine that 38501 was defendant's permanent address, and also learned that Ashley has a residence "down the road." Sieling knew that Ashley participates in the hog-farm business at 38501. Sieling testified that he checked a secretary of state listing on a website, which stated that Ashley was a "part-owner" of the hog farm.[4] Sieling also checked a local, Frazee phone book, which listed Ashley's address as 38501. Sieling also testified that Allen Jensen, an employee of the hog farm, answered "yes," when Sieling asked if Ashley usually stayed at and lived at 38501. Jensen then pointed Sieling in the direction of Ashley. Sieling also testified that he had been to the Briards' hog farm before and had been "familiar with the operation" for approximately 25 to 30 years. Sieling testified that, once he left the subpoena on the back of the truck, Sieling and another officer wrote down all the license plates of the vehicles in the

yard. They then circled back and saw that the subpoena was no longer there. Once they returned to the sheriff's office, they ran the license plate numbers and four of them were registered to Ashley. Sieling did not recall what the addresses were on the vehicle registration. On cross-examination, Sieling acknowledged that a Yellow Book phone book listed two addresses for Ashley: 38117 County Highway 56, followed by 38501. Sieling also acknowledged that Ashley's driver's license application in 2001 listed 38117 as his address, and agreed that a March 2009 phone bill for Ashley was addressed to 38117. The 38117 address belongs to a farm about a quarter to half of a mile away from the 38501 farm.

Jensen also testified. Jensen had worked at the hog farm for approximately six years; knew both Ashley and his wife, Kim Briard; and considered Ashley to be his boss. Jensen did not know the address where Ashley and Kim resided, but knew "it's the next place over" at "another farm," approximately a quarter to half of a mile away. Jensen testified that he did not tell Sieling that Ashley lived at 38501 "[b]ecause they don't live there," and did not recall being asked whether Ashley lived at 38501. Jensen later clarified that Sieling had not asked him whether Ashley lived at 38501. Jensen said he had daily contact with Ashley at 38501 in connection with the hog business.

Ashley's wife, Kim, testified at the hearing as well. She testified that she had been married to Ashley for 16 years; never lived at 38501; and has always lived with her husband at 38117. Kim also testified that phone-company records showed two phone numbers billed to Ashley at

---

**3.** Defendant also moved to suppress evidence allegedly obtained during a search of defendant's home and to change venue.

**4.** The website actually lists Ashley as an agent of the farm.

38117, one of which was for the barn and shop located at 38501 and one of which was for their home at 38117. Kim stated that her husband was a "partner" in the hog farm and "ran the business." She testified that Ashley was at the hog farm every day, including weekends, and was the primary person in charge of employees. Kim also confirmed that a local parish directory listed her family as residing at 38117, but, while testifying that the family still belongs to the church, she acknowledged that her family stopped attending services approximately a year and a half earlier.

The district court denied defendant's motion to dismiss for lack of jurisdiction and lack of probable cause. The district court found that the service of the October subpoena was properly made on defendant via substitute service on husband, who was of suitable age and resided at their residence, and did not amount to service by a party. As for the December subpoena, the district court found there was a sufficient nexus between Ashley and defendant for service to have been effectuated, noting the familial relationship, Ashley's daily presence at defendant's home, and phone listings supplying both the 38501 and 38117 addresses. In reaching its conclusion, the district court relied on caselaw interpreting service of process under the civil rules based on the lack of criminal cases addressing similar service of process issues. The district court also noted that defendant, husband, and Ashley were all clearly aware of what was going on. The district court concluded that probable cause existed on all counts based on defendant's failure to appear at husband's trial, noting that defendant eventually turned herself in based on a warrant issued for her arrest and "[a]t the time she turned herself in, her appearance had changed significantly—changing her hair color and style."

Defendant subsequently requested that the questions of jurisdiction and probable cause be submitted to this court as certified questions. Noting that both defendant and the state agree that the issue of service of process could be dispositive of this case, the district court certified to this court the questions of whether substitute service on defendant via husband was sufficient for the October subpoena and whether substitute service on defendant via Ashley was sufficient for the December subpoena.

## ISSUES

I. Is substitute service of process of a subpoena for a witness in a criminal case valid under Minn. R.Crim. P. 22.03 when service is made upon a person who resides in the same abode as the witness and who is also a defendant in the criminal proceeding for which the witness is to appear and testify?

II. Is substitute service of process of a subpoena for a witness in a criminal case valid under Minn. R.Crim. P. 22.03 when service is made upon a person who does not reside in the same abode as the witness?

## ANALYSIS

We begin with two preliminary matters. First, pursuant to the rules of criminal procedure, the district court may certify any question of law which, in the district court's opinion, "is so important or doubtful that the Court of Appeals should decide it." Minn. R.Crim. P. 28.03. The district court must specify the precise question certified to this court for review. *State v. Saunders*, 542 N.W.2d 67, 69 (Minn.App.1996). The district court phrased the certified questions as follows:

1. Whether substitute service of a subpoena for a witness (Wife) in a crim-

inal case is valid under Rule 22.03 of the MN Rules of Criminal Procedure when the subpoena is given to husband for delivery to witness (Wife) who resides in the same abode, when the husband is also the Defendant in the criminal proceedings for which witness (Wife) is subpoenaed to appear and testify; and

2. Whether substitute service of a subpoena for a witness (Mother) in a criminal case is valid under Rule 22.03 of the MN Rules of Criminal Procedure when the subpoena is given to the adult son of witness (Mother) who is at her (Mother's) residence 365 days a year, who owned and operated a business from that address, whose address in the local phone book was the same as witness's (Mother's) home address, when it is later determined that the adult son actually resided in a residence a quarter-mile down the road with his family.

We may rephrase these questions, however, in order to more accurately state the issue at hand. *See id.* at 69 ("Where the certified question is inaccurately stated, the reviewing court may revise the question."). Here, we have revised the district court's questions in order to better crystallize the legal issues involved and eliminate extraneous factual information:

1. Is substitute service of process of a subpoena for a witness in a criminal case valid under Minn. R.Crim. P. 22.03 when service is made upon a person who resides in the same abode as the witness and who is also a defendant in the criminal proceedings for which the witness is to appear and testify?

2. Is substitute service of process of a subpoena for a witness in a criminal case valid under Minn. R.Crim. P. 22.03 when service is made upon a person who does not reside in the same abode as the witness?

■ Second, defendant's principal brief begins her analysis under each certified question by arguing that there is no probable cause to believe that she knowingly and willfully disobeyed the subpoenas based on the allegedly deficient substitute service. The state correctly points out that the function of certification is to submit important or doubtful questions of law and "not the general question of whether evidence shows or proves defendant to be guilty or innocent, which is a mixed question of fact and law to be decided by the jury, aided by the advice of the [district court] judge as to the law of the case." *State v. Moller*, 276 Minn. 185, 187, 149 N.W.2d 274, 276 (1967); *see State v. Lopez*, 778 N.W.2d 700, 703 (Minn.2010) ("A person may be charged with a crime only where there is probable cause to believe that the person is guilty—that is, where facts have been submitted to the district court showing a reasonable probability that the person committed the crime."). The questions before us, therefore, are only legal questions relating to whether service of the subpoenas was effective under Minn. R.Crim. P. 22.03, although we note that, at the omnibus hearing, both parties appeared to agree that the service issue is dispositive of defendant's criminal charges.

We now turn to the certified questions. A person may be subpoenaed to appear as a witness in relation to criminal proceedings. Minn. R.Crim. P. 22.01 (stating witness may be compelled to appear before a grand jury, at a hearing of the district court, at trial, or at a deposition). "Failure to obey a subpoena without adequate excuse is a contempt of court." Minn. R.Crim. P. 22.05. Rule 22.03 governs service of witness subpoenas and states:

A subpoena may be served by the sheriff, a deputy sheriff, or any person at least 18 years of age who is not a party.

Service of a subpoena on a person must be made by delivering a copy to the person or *by leaving a copy at the person's usual place of abode with a person of suitable age and discretion who resides there.*

A subpoena may also be served by U.S. mail, but service is effective only if the person named returns a signed admission acknowledging personal receipt of the subpoena. Fees and mileage need not be paid in advance.

Minn. R.Crim. P. 22.03 (emphasis added). ■ Defendant was never personally served with either the October or December subpoena and does not appear to admit that she actually received them. Thus, in order for service of the subpoenas to have been properly effectuated, the subpoenas had to have been served by leaving a copy of the subpoena at defendant's "usual place of abode" with "a person of suitable age and discretion," and such person must also "reside[ ] there." *See id.* It appears undisputed that both subpoenas were delivered to the defendant's usual place of abode, located at 38501. Therefore, the question becomes whether husband and Ashley were suitable persons for service. We review a district court's interpretation of a rule of criminal procedure de novo. *State v. Lee,* 706 N.W.2d 491, 493 (Minn.2005).

As noted by the district court, there appears to be very little caselaw on service of process for a subpoena in the criminal context. We are aware of a few unpublished decisions of this court, but in these cases the absent witness was the victim of the alleged crimes and the issue was the admissibility of the victim's prior statements to police and medical personnel in the context of hearsay and a defendant's rights under the Confrontation Clause. *See, e.g., State v. Patton,* No. C2–96–2220, 1997 WL 327675 (Minn.App. June 17, 1997); *see also* Minn.Stat. § 480A.08(3)(c) (2008) (stating unpublished opinions of this court are not precedential). The question of whether service of the subpoena was proper was not squarely before this court and it does not appear that the witnesses who failed to appear in those cases were subsequently charged with criminal contempt.

■ As the district court observed, the rules of civil procedure utilize nearly identical language to Minn. R.Crim. P. 22.03 for service of a summons or a subpoena. *See* Minn. R. Civ. P. 4.03(a) (stating service of a summons may be made "[u]pon an individual by delivering a copy to the individual personally or *by leaving a copy at the individual's usual place of abode with some person of suitable age and discretion then residing therein"* (emphasis added)), 45.02 ("Service of a subpoena upon a person named therein shall be made by delivering a copy thereof to such person or *by leaving a copy at the person's usual place of abode with some person of suitable age and discretion then residing therein....*" (emphasis added)). And, as discussed below, the district court correctly noted that "there is a body of law interpreting service of process under the civil rules which addresses the 'then residing therein' requirement." But while the district court reasoned that it would be "absurd" to "disregard the caselaw interpreting civil cases because it is clear that the intent of both the civil and criminal rules are the same—to ensure the person is given notice of an action and that service is reasonably calculated to reach the person to whom it is intended," the liberty interest at stake in defendant's criminal proceedings limits the extent to which the

civil cases can be deemed instructive. *See State v. Williams*, 762 N.W.2d 583, 587 (Minn.App.2009) (stating court "construes criminal statutes strictly"), *review denied* (Minn. May 27, 2009); *State v. Wagner*, 637 N.W.2d 330, 337–39 (Minn.App.2001) (noting the "different interests at stake" between civil implied-consent proceedings and criminal DWI charges and holding collateral estoppel does not apply against a DWI defendant in a criminal case when the defendant unsuccessfully litigated the same issues in an earlier implied-consent proceeding as "[w]hile a petitioner in an implied-consent proceeding has only his driving privileges at stake, a criminal defendant has a fundamental liberty interest at stake").

## I.

■ Defendant correctly points out that the rules of criminal procedure prohibit a party from serving process. *See* Minn. R.Crim. P. 22.03. Husband was the defendant in the criminal trial for which his wife's testimony was sought. Husband was plainly a party and would be prohibited by rule from serving the subpoena on defendant. Defendant briefly argues that any subsequent presentation of the subpoena by husband to her would amount to service by a party because of husband's status as the defendant in the underlying criminal action. Caselaw is clear, however, that the person upon whom substitute service is made does not take on the role of the process server when the documents are later given to the intended recipient. *Peterson v. W. Davis & Sons*, 216 Minn. 60, 66, 11 N.W.2d 800, 804 (1943) ("Substituted service was made upon this defendant by leaving a copy of the summons and the complaint with his wife at his place of residence."); *Stransky v. Ind. Sch. Dist.*, 439 N.W.2d 408, 410 (Minn.App.1989) (concluding substitute service by party on wife of opposing party was insufficient and re-

sulted in impermissible service by a party on a party as service was complete when party served wife and not when wife handed documents to husband), *review denied* (Minn. July 12, 1989).

■ The heart of defendant's argument, however, is that husband was not a person of "suitable discretion" because of his "defendant" status in the criminal case in which the subpoena was issued. Defendant asserts that "[i]t is easy to imagine how a *criminal defendant* having to give his or her *spouse* a subpoena compelling her appearance to *testify against* the defendant, or even informing the spouse that the subpoena had been delivered, would create not only acrimony, but also a situation ripe for violence." Defendant contends that husband's defendant status "creates too great a likelihood that the subpoena will not get to the person named in it, or that if it does, it will occasion acrimony if not outright violence." We agree.

Although in the context of a civil summons and complaint, we have previously recognized the rationale behind the prohibition of one party serving process on another party. In *Lewis v. Contracting Northwest, Inc.*, we observed that "[t]he rationale behind this restriction is to eliminate bias, acrimony and possible oppression which is inherent in litigation." 413 N.W.2d 154, 155 (Minn.App.1987); *see also* 62B Am.Jur.2d *Process* § 125 (2005) ("The intent of a statute or common law rule prohibiting personal service of process by parties is to discourage fraudulent service by persons with an adversarial interest in a legal action.... Indeed, it has been stated that it is difficult to conceive of a greater opportunity for mischief than to allow interested litigants to aver that they have made service in their own behalf.").

■ As we observed in *O'Sell v. Peterson*, "[s]ervice of process is intended to give notice to a defendant and, thus, service of process must be reasonably calculated to reach the defendant." 595 N.W.2d 870, 872 (Minn.App.1999) (citing *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950)). In *Mullane*, the United States Supreme Court stated:

> But when notice is a person's due, process which is a mere gesture is not due process. *The means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it.* The reasonableness and hence the constitutional validity of any chosen method may be defended on the ground that it is reasonably certain to inform those affected, or, where conditions do not reasonably permit such notice, that the form chosen is not substantially less likely to bring home notice than other of the feasible and customary substitutes.

339 U.S. at 315, 70 S.Ct. at 657–58 (emphasis added) (citation omitted).

We recognize the state's argument that husband was of suitable discretion as contemplated by Minn. R.Crim. P. 22.03 "because he was a person fully possessed of his faculties and of ordinary intelligence." Defendant does not appear to argue otherwise. *See Temple v. Norris*, 53 Minn. 286, 288–89, 55 N.W. 133, 134 (1893) (concluding absent any averment that person upon whom substitute service was made "was not ordinarily intelligent, and in full possession of [his or her] faculties," presumption is "that [the person] was well informed, and as capable, as the ordinary [person of similar age]"). Likewise, the law does not require that "the person with whom legal service is left must understand the legal import of the papers." [5] *Holmen v. Miller*, 296 Minn. 99, 103, 206 N.W.2d 916, 919 (1973) (citing *Temple*, 53 Minn. 286, 55 N.W. 133).

■ However, we are persuaded by defendant's argument that husband was not of suitable discretion and that substitute service upon him was not reasonably calculated to reach defendant given his interest in the underlying proceedings as it essentially superimposed upon defendant and husband the very adversarial relationship that proscriptions against service by a party upon a party were intended to prevent. *See Lewis*, 413 N.W.2d at 155; *cf. Willette*, 421 N.W.2d at 346 ("The purpose of the marital testimonial privilege is to promote family harmony by precluding one spouse from testifying against the other without consent."). Indeed, husband refused to take the subpoena from the investigator who served it; would not respond to the investigator when the investigator asked him what he should do with the subpoena; and ultimately pointed to the doormat outside and closed the door without picking up the subpoena. Substitute service upon a person of suitable age and discretion residing within the intended party's abode is permitted because "in all probability," the party will receive it. *Lovin v. Hicks*, 116 Minn. 179, 182, 133 N.W. 575, 576–77 (1911). The highly volatile nature of this situation and the circumstances upon which substitute service was made on defendant via her husband were not reasonably calculated to apprise defendant of the October subpoena and thus amounted to deficient service of process. *See Mullane*, 339 U.S. at 314–15, 70 S.Ct. at 657 ("But if with due regard for the practicalities and peculiarities of the case

---

**5.** In any event, the investigator's affidavit shows that husband likely understood the import of the October subpoena as he told the investigator that he was "not getting involved in that."

[service] conditions are reasonably met the constitutional requirements are satisfied."). Thus, we conclude service of the October subpoena was not valid under Minn. R.Crim. P. 22.03 and answer the first question in the negative.

## II.

As stated above, Minn. R.Crim. P. 22.03 allows for substitute service of a subpoena at the person's abode on someone who *resides* therein. Defendant contends that service of the December subpoena was deficient because Ashley did not reside at 38501. We agree.

Again in the civil context, "[t]he term 'house of usual abode' means a person's customary dwelling place or residence." *Lovin*, 116 Minn. at 181, 133 N.W. at 576; *see also Black's Law Dictionary* 1335 (8th ed. 2004) (defining residence as including "[t]he fact of living in a given place for some time"; "[t]he place where one actually lives, as distinguished from domicile"; and "[a] house or other fixed abode; a dwelling").

> The words "*at* his house of usual abode" do not mean "*in*" such house. The word "at" expresses the idea of nearness of place, and is less definite than "in" or "on." A service made on the steps or walk leading to a defendant's house of abode would be "at" such house, as would probably be a service made in a shed or garage, belonging to defendant, situated near the house, providing, of course, that the copy was left with a person of suitable age and discretion who resided in the house.

*Lovin*, 116 Minn. at 181–82, 133 N.W. at 576. "Presumptively, in the case of a married man, his house of usual abode is where his wife and family reside." *Id.* at 181, 133 N.W. at 576.

Relying on *O'Sell*, the district court concluded that there was a sufficient nexus for service between defendant and her son Ashley. *See* 595 N.W.2d at 872–73 (holding that a determination of whether an individual is "residing therein" requires a nexus between the individual and the intended party establishing a reasonable assurance that notice would reach the intended party, which can be demonstrated by a confidential relationship, including familial; the duration and frequency of an individual's presence and the individual's intent to return; and evidence that the service actually reached the intended party). The district court focused on the familial relationship and Ashley's daily presence at 38501 in connection with the hog-farm operations. Noting that the local phone book had both the 38501 and 38117 addresses listed for Ashley, the district court found that Ashley's home was located less than half of a mile away from defendant's residence.

However, the plain language of Minn. R.Crim. P. 22.03 provides that substitute service is made upon a person who *resides* in the same abode as the intended party. *See Williams*, 762 N.W.2d at 587 (construing criminal statutes strictly); *Wagner*, 637 N.W.2d at 337 ("[B]ecause the implied-consent proceeding is civil, presumptions, burdens of proof, and evidentiary rules are different from a criminal proceeding."). We note that "[t]he location of a person's usual place of abode is a question of fact, and the decision of the district court will not be reversed unless it is clearly erroneous." *Lundgren v. Green*, 592 N.W.2d 888, 890 (Minn.App. 1999) (quotation omitted), *review denied* (Minn. July 28, 1999). However, the record clearly reflects that Ashley did not reside with his parents at 38501. As his wife testified, she and her husband have lived at 38117 with their children for the past 16 years. Sieling also testified that he learned Ashley lived "down the road" when he inquired about defendant's resi-

dence at the post office *prior to* service of the December subpoena.[6] And although Ashley was at 38501 every day in connection with the hog business, the Minnesota Supreme Court has concluded that service on an employee at the defendant's home was insufficient as service was not made upon the defendant personally or a person residing in the defendant's abode. *Heffner v. Gunz*, 29 Minn. 108, 109–10, 12 N.W. 342, 342 (1882). Accordingly, we conclude that service of the December subpoena was not valid under Minn. R.Crim. P. 22.03 and answer the second question in the negative.

### DECISION

Substitute service of the October subpoena on defendant's husband compelling defendant to appear as a witness in husband's criminal trial was not effective under Minn. R.Crim. P. 22.03 because her husband was not a person of suitable discretion. Substitute service of the December subpoena on defendant's son was not effective under Minn. R.Crim. P. 22.03 because her son did not reside within defendant's abode.

**Certified questions answered in the negative.**

---

**6.** Notably, the following exchange also took place between Sieling and the prosecutor at the hearing:

> MR. GRAY: You knew that Ashley Briard lived at the next farm, correct?
> SIELING: I knew he owned another farm over there.

> MR. GRAY: No. The question was there. You knew he lived at the other farm, at 38117 with his wife and five kids?
> SIELING: I knew he owned another farm. That's my answer. Yes.